GEDNEY (KING v.). See Case No. 7,795.

## Case No. 5,294a.

### GEDNEY et al. v. L'AMISTAD.

[Betts' Scr. Bk. 121.]

District Court, D. Connecticut. Jan. 7, 1840.

ADMIRALTY—HIGH SEAS—JURISDICTION—SALVAGE SERVICE—COMPENSATION—SPANISH TREATY —FOREIGN VESSELS.

[1. A vessel lying, when seized, a half mile from shore off Colloden Point, Long Island, though in Long Island Sound, is on the high seas, and the court into whose district she is first carried has jurisdiction.]

[2. The fact that persons from a ship lying in the open sea, a half mile from shore, were on shore when she was seized, will not prevent the court of another district into which the ship was first carried taking jurisdiction of them, where it appears that they were only temporarily on shore to get provisions.]

[1] [Reprinted by permission.]

[3. The seizure and bringing into port of a vessel in distress in command of African negroes totally ignorant of the science of navigation, who shipped as slaves, had killed the commanding officers, imprisoned their owners, and assumed command, is a salvage service.]

[4. The court awarded one third the appraised value of vessel and cargo as salvage compensation, but refused salvage as to the slaves, they having no value as such in the district (Connecticut), and there being no law under which they could be sold.]

[5. The provision in the treaty of 1795 with Spain, requiring the contracting parties to furnish vessels of one, that put into the ports of the other in distress, necessities at reasonable rates, and to cause to be restored vessels and effects taken from the owners within their jurisdiction, does not prevent an award for salvage in seizing and bringing into port, by a United States naval vessel, a Spanish ship in distress, in command of African negroes who shipped as slaves, had killed the commanding officers, imprisoned their owners, and assumed command.]

[6. A custom of a foreign country cannot be set up in opposition to its written laws by one claiming as a citizen of such country.]

[7. Negroes imported into Cuba in violation of the Spanish law, which declares such negroes to be free, were sold at Havana, to Spanish citizens, and shipped, under a false pass, as Ladinos, on board a Spanish coasting vessel for another port of Cuba. After a few days out, they killed the master and cook, imprisoned their owners, and assumed command of the vessel, and after many days were found in distress, seized, and taken into port by a United States naval vessel. Held, that as, under the Spanish law, there could be no title to such negroes, they should not be delivered up as property of Spanish subjects, although the custom in Cuba is opposed to the law; but that such negroes, under the act of March 3, 1819 (3 Stat. 532), should be ordered delivered up to the president of the United States to be transported to Africa.]

[This was a libel in rem by Lieut. Thomas R. Gedney and others against the schooner L'Amistad for salvage.]

JUDSON, District Judge. On the 26th of August, 1839, Lieut. Gedney, commanding the brig Washington of the United States navy, seized and brought into the port of New London, in this district, the schooner L'Amistad, with a cargo of goods and 49 Africans, then claimed as slaves by Don Pedro Montez and Don Jose Ruez, subjects to her Catholic majesty the queen of Spain —the said Montez and Ruez also being on board the schooner. On the arrival of the schooner within this district, New London being the first port into which the schooner was brought after her seizure, a libel was filed here by Lieut. Gedney, the officers and crew of the brig Washington, claiming salvage. At a special district court, held on the 19th of September, other libels were also filed in the following order: That of Jose Ruez; that of Pedro Montez; that of Henry Green and Peletiah Fordham; a libel in behalf of the United States by the district attorney, first, claiming that the vessel, cargo, and slaves be restored to the owners, being Spanish subjects, and secondly, demanding that the negroes be delivered up to the pres-

ident to be transported to Africa; that of the Spanish consul claiming Antonio. And on the 19th day of November another libel was also filed, by the district attorney, in favor of the United States, alleging that the Spanish minister had, in pursuance of the treaty between the United States and Spain, demanded of the government of the United States, the restoration of the schooner L'Amistad, her cargo, and the slaves on board for the owners thereof, being subjects of Spain. The ordinary process of attachment issued, and the schooner, goods, and Africans so alleged to be slaves were taken into custody by the marshal of this district, for adjudication upon these various libels and claims. At the district court in November, a part of these Africans, by their counsel, filed a plea to the jurisdiction of this court, alleging that they were born in Africa, that they were free, and that they were seized within the territorial jurisdiction of the state of New York, claiming to be set at liberty. This plea is now withdrawn, and an answer is filed alleging, substantially, as follows: That Cinquez, Banna 1st, Damma, Fawni 1st, Phumah, Connoma, Choday, Bunnah 2d, Baah, Cebba, Pooma, Kimbo, Peeah, Bangyah, Saah, Coelee, Parte Mona, Nahquoi, Jesse, Con, Fawni 2d, Kenna, Laummee, Fajana, Jebboy, Fauguanah, Bewnu, Cherkenall, Gubbo, Curre, Seme, Kene, Majera, are all Africans, entitled to their freedom; that the said schooner was at anchor near Colloden Point, within the territorial jurisdiction of the state of New York, and that part of said Africans, as named in said plea and answer, were on shore on Long Island, within the jurisdictional limits of the state of New York; whereupon they say that this court hath no jurisdiction over their persons, praying to be discharged. Lieut. Gedney now appears and pursues his claim for salvage. Henry Green and Mr. Fordham appear and pursue their claims for salvage. The district attorney of Connecticut pursues the libels filed by him in behalf of the government of the United States, and in behalf of the minister of Spain, for a restoration of the ship, cargo and slaves, under the treaty between Spain and the United States.

In the discussion of this case have been involved numerous questions, of great importance, requiring, as we have seen, industrious examination and patient deliberation. It has been my endeavor to afford time for this investigation; and the ability with which these questions have been discussed at the bar must satisfy all, that everything which talent and learning could accomplish has been done. It devolved upon the court to dispose of these various and complicated questions, in such manner as will seem to be demanded by the laws of the land, and of this the responsibility rests on me. That responsibility will be met, and when discharged according to the dictates of my own conscience, I shall be relieved from its further perplexities. It will be a satisfaction, while doing this, that neither party or claimant can be prejudiced by my determination, because the laws secure an appeal to the highest tribunal in this country, where my decision may be reviewed, and if wrong corrected. It is then of little importance to the persons in interest, what may be the determination of this court, for a case like this will not and should not rest upon a single trial, without review before the supreme court, in whose decisions all would be satisfied. The case is not only important to those immediately interested, but there are involved principles important to the nation and the world. If a few months have elapsed since this cause has been pending, it has been owing to circumstances beyond my control, but this surely has produced no inconvenience or suffering to those in custody. They have all been humanely treated; liberally fed and clothed by the government, into whose hands they have been providentially cast. Whatever may be the final result of this case, so far it may be safely said that not one step has been taken which could have been avoided. I do not stop to say that it is my wish to escape the responsibilities which devolve upon me; neither would it be just to myself to say that I have not been deeply anxious to investigate this case, and decide it according to its true merits.

The first question to which my attention is called, is that of jurisdiction. Although the first plea has been withdrawn, yet the allegations in the present answer require an examination of the evidence with that view. If, indeed, the evidence does not show a case, of which the court has cognizance by law, it will be my duty still to dismiss it. In point of fact where was the L'Amistad seized? It will be recollected that at a former district court, the attorney for the United States was directed to examine this place, in company with the counsel on the other side: this has been done, and on a careful examination of the evidence, I find as a matter of fact, that the schooner lay in 3½ fathoms of water, where the tide ebbs and flows, not less than half a mile from the shore, off Colloden Point, five or six miles from Montauk; about 25 miles from Sag Harbor; 18 miles from New London,—not in any known harbor, bay, river or port.

The jurisdiction of the district court is wholly regulated by statute. By the laws of congress, each district court has exclusive jurisdiction over all seizures made within that district. A vessel seized in one district, cannot be carried into another for adjudication. Another branch of the statute provides that where the seizure is made on the high seas, the vessel seized may be carried into any district in the United States, and must be tried where first carried in. Was the schooner L'Amistad seized on the high seas? The answer to the question de-

pends on the legal signification of the term "high seas," as used in the judiciary act of 1789. Here I have no path to mark out for others, but only to adopt the language of learned jurists who have gone before, and yield my assent to determinations already made. To the former I can listen with respect, but by the latter I am bound to yield obedience, as to the settled law of the land. Perhaps a more conclusive argument cannot be found, than that of Mr. Webster, before the supreme court, in the case of U. S. v. Cevins, 3 Wheat. [16 U. S.] 336. This is the language: "The common and obvious meaning of the expression 'high seas' is also the true legal meaning. The expression describes the open ocean, where the dominion of the winds and the waves prevail, without check or control. Ports and havens, on the contrary, are places of refuge, in which protection and shelter are sought, from this turbulent dominion, within the enclosures and projections of the land. The high seas and havens, instead of being of similar import, are always terms of opposition. The high seas imports the uninclosed and open ocean, without the fauces terrae. Ports and havens are not parts of the high seas; they are within the bodies of the counties." This lucid exposition of the term "high seas" accords with all the learned commentators, ancient and modern. It may be added, that the place must be where the tide ebbs and flows, and the high seas extend to low water mark, but do not extend to harbors, ports or rivers.

In this case the seizure was not made in any harbor, port, bay or river. There is scarcely an indentation of the coast between Montauk and Colloden Point. Had the schooner been seized within a port or harbor like Sag Harbor, Black Rock or Gardner's Bay, the aspect of the case would have been changed. But this was in fact many miles from any known port or harbor. The place of seizure was therefore in the open ocean, "where the dominion of the winds and the waves prevail without check or control." That it was near Montauk, that it was less than one mile from the shore, does not vary the legal result. The well known position of Montauk adds conclusiveness to the argument. We all understand from childhood, that Montauk is a point of land projecting into the sea. The waters of the open ocean have been beating there for ages past, and must continue during all time to come. The waves of the Atlantic roll all over, in constant succession, the spot where the L'Amistad lay, when seized by the Washington. This proposition does not rest on mere argument. It has the sanction of high judicial authority. Judge Story, eminent here, and elsewhere, as a jurist, puts an end to all doubt and cavil, and compels me to hold cognizance of this case. The Abby [Case No. 14] was determined by the circuit court in the First circuit, and from that case I quote the opinion of Judge Story, as follows: "I agree (says the learned judge) that the court below had no cognizance of the cause, if the seizure, on which the libel was founded, was in the port of Portland, for the judiciary act of 1789, c. 20, § 9 [1 Stat. 73], gives exclusive jurisdiction of all seizures, made within any district, to the district court of such district. Concurrent jurisdiction exists in the district courts of other districts, only where the seizure is on the high seas. But the objection here fails in point of fact. The seizure (of the Abby) was first made about 5 miles off Cape Elizabeth, and was therefore on the high seas, since all waters below the line of low water mark on the sea coast are comprehended within that description; and when the tide flows, the waters to high water mark are also properly the high seas."

Will it be seriously urged, that because the L'Amistad had passed Montauk light, that she was not on the high seas? Suppose she had actually been 25 miles further to the northwest in Long Island Sound, with Long Island on the south, Connecticut on the north, Gardner's Island, Fisher's Island, Plumb Island and Block Island to the east, would she have been, even then, within the body of any county? For all purposes of admiralty, Long Island Sound is to be considered high seas. In the case of The Elizabeth [Case No. 4,352], it was held that Long Island Sound does not belong to either Connecticut or New York, nor to any district in either of those states. Surely, then, the waters upon either side of Montauk cannot be deemed within the exclusive jurisdiction of the district court of New York. Whether she was within the territorial jurisdiction, in another sense, is not important to this question. The question is, was she within the exclusive jurisdiction of the district court of that state? She was not. To say otherwise would be a perversion of the plain provisions of the act of congress and an utter defiance of all authority. This cannot be done. It is the business of this court to pronounce what the law is. These principles being settled, and applied to the facts of this case, the consequence follows, that the seizure of the L'Amistad was made on the high seas, and having been first brought into the district of Connecticut, the jurisdiction of this court attaches to the whole subject matter.

This opinion does not conflict with the opinion of the circuit court, as pronounced in September last. I refer now to that part of the case which was before the grand jury, relating to the murder of Capt. Ferrer. That case turned upon the national character of the vessel. The L'Amistad was owned by a Spanish subject, she sailed under a Spanish flag, was commanded by a subject of the queen of Spain, and the homicide was committed by Africans, on board this foreign vessel. No court in the United States could hold jurisdiction of that case. The laws of Spain alone could reach the act. In the ad-

ministration of criminal law, the offence must be punished where committed. It is an universal rule. A crime committed in England cannot be tried here. A crime committed in one state is no offence against the laws of another state. A crime committed in one county cannot be tried in another county. Had this schooner been an American vessel, the court would have held cognizance of that case.

It has been urged as a matter of law, that the Africans on shore at the time the vessel was seized cannot be subject to the admiralty power of the Connecticut district, nor any other admiralty jurisdiction. The only reply which need be given to this claim is, that those on shore were there for a specific and temporary object, to furnish the vessel with water and provisions ·for the continuance of their voyage to Sierra Leone. They were still attached to the schooner, in the same. manner as those who continued· on board. The case seems not to require any distinction of this sort, and none can be recognized. Kent, Comm. 379. If the admiralty has cognizance of the principal thing, it has also of the incident, though that incident would not, of itself, and if it stood for a principal thing, be within the admiralty jurisdiction. Bl. Comm. 108; 1 Com. Dig. 396, tit. F. 6. The libel of Thomas R. Gedney and others is properly filed here.

Having disposed of the question of jurisdiction, I proceed to the consideration of the merits of the cause. The facts involved may be stated in a few words; and about these facts there is little diversity ·of thought. A Spanish vessel owned in Cuba, proceeded. from thence to the coast of Africa, and having procured a cargo of native Africans, returned and landed them near Havana, where they were put into a slave mart for sale. Within fifteen days from the time of landing, Jose Ruez and Pedro Montez, subjects to the queen of Spain, and residents of Guanaja, in the province of Puerto Principe, on the island of Cuba, being at Havana, purchased fifty-four of these Africans. The schooner L'Amistad, then lying in the port of Havana, possessing rightfully the national character of a Spanish vessel, owned and commanded by one Raymond Ferrer, master, and regularly and lawfully licensed in the coasting trade, between the ports of Havana and Guanaja, and being laden with Spanish goods for the latter port, the said Ruez and Montez put on board thereof the said fifty-four Africans with permits from the governor of the island of Cuba, to be transported as freight to the said port of Guanaja; and the said Ruez and Montez took passage in said schooner. All grounds of suspicion that the L'Amistad had been in any wise connected with the original importation of these Africans, are wholly excluded from the case. Three days from Havana the negroes rose up on the vessel and killed the master and cook. and by force took command. and after being 63 days upon the ocean, she came into the waters of the United States, in a condition perilous to the vessel and the lives of Ruez and Montez and all others on board. Being found as heretofore stated, the schooner and all belonging to her were seized by the brig Washington, and from thence were brought into the port of New London, within the district of Connecticut; and the schooner, cargo, and Africans now claimed as slaves, are here libelled for salvage by Lieut. Gedney, &c. Having stated these various claims, and the circumstances of the seizure, I will now proceed to the consideration of each claim, somewhat in the order in which they stand upon the record.

1. The claim of the officers of the brig Washington. In considering and disposing of this claim, it may not be improper to divide it into two parts: 1st. The vessel and goods. 2d. The Africans alleged to have been the slaves of Messrs. Ruez and Montez.

1st. The claim to salvage for the vessel and goods stands upon grounds almost beyond question. The services rendered by Lieut. Gedney were not only meritorious, but highly praiseworthy. They were such as would entitle the seizor to his proper allowance. The vessel was at the mercy of the winds and waves. She was in the possession and under the command of these negroes, who were utterly ignorant of the science of navigation, without law or order, without commission of any lawful authority, guided alone by their ignorance and caprice, just on the point of sailing for the coast of Africa, and yet without the possibility of conducting the vessel in safety for a single day. The ·seizure under such circumstances was meritorious,· and will entitle the seizors to an adequate compensation, unless something shall be found in the case to oust them of this right. In opposition to this claim, Pedro Montez and Jose Ruez allege that they each of them own a part of these goods, and the minister of her Catholic majesty, in behalf of the owners of the schooner and the residue of the goods on board, alleges that the whole were owned by the subjects of the queen of Spain, and that, under the treaty between Spain and the United States, a restoration, entire, should be decreed. Here it may be remarked, that Montez and Ruez have ceased to prosecute their claims in person, and the Spanish minister comes in the name of his government, basing ·himself on the treaty of 1795, which has some bearing on this question and reads as follows: Article 8: "In case the subjects and inhabitants of either party, with their shipping, whether public and of· war. or private and of merchants, be forced through stress of weather, pursuit of pirates or enemies, or any other urgent necessity, for taking of shelter and harbor, to retreat and enter into any of the rivers, bays, roads or ports, belonging to the other party. they shall be received and treated with all humanity, and enjoy all favor,

protection and help, and they shall be permitted to refresh and provide themselves, at reasonable rates, with victuals and all things needful for the subsistences of their persons or reparation of their ship and prosecution of their voyage; and they shall in no ways be hindered from returning out of the said ports or roads, but may remove and depart, when and whither they please, without any let or hindrance." Article 6: "Each party shall endeavor, by all means in their power, to protect and defend all vessels, and other effects belonging to the citizens or subjects of the other, which shall be within the extent of their jurisdiction by sea or by land, and shall use all their efforts to recover, and cause to be restored to the right owners, their vessels and effects, which may have been taken from them within the extent of their said jurisdiction, whether they are at war or not with the power whose subjects have taken possession of said effects."

A treaty is binding upon the two nations making it, and the same becomes a part of the laws of each country. It is to be expounded by the same rules of construction as are applied to other laws; and it becomes the duty of the judicial department, as well as the executive of each country, to carry them into effect. The fair and liberal construction of these two articles must be applied to the schooner L'Amistad and the goods, for those are the effects of the subjects of Spain. And by effects I understand their lawful property. It is the duty of Lieut. Gedney, by all means in his power, to protect and defend this vessel, and use all his efforts to recover and cause to be restored to their rightful owners the schooner and her effects, because, by an urgent necessity, provided for in the eighth article, she had taken shelter in our waters, and now, at reasonable rates, this vessel and her effects must be restored to their rightful owners. But it can not be supposed that in a case of a demand for a restoration a liberal construction should be given to this treaty. Suppose the hull of a vessel coming in like this had been so far damaged that without immediate repairs she could not be kept above water, and these repairs were made, can now the material men (as they are called) libel the vessel in a court of admiralty here and recover these repairs? Certainly. It must be, as the treaty provides, "at a reasonable rate." So in this case, the services in saving of this vessel must be compensated, "at a reasonable rate." The manner of doing this will be shown hereafter. It results, then, that the seizors are entitled to salvage. This lien is placed upon the vessel and her effects by the laws of all nations. It is founded on the broad principles of justice acknowledged by all, and the treaty stipulation is entered into with this lien, which cannot be considered as inconsistent with the treaty. The decree will be, that the schooner and her effects be delivered up to the Spanish government upon the payment, at a reasonable rate, for the

services in saving this property from entire loss. An appraisement will be ordered, and one third of that amount and costs will be deemed just and reasonable.

The next question is, can salvage be allowed upon the slaves? There are insuperable objections to this portion of the claim. There is no foundation here laid for a decree in personam. The decree, if at all, must operate in rem. That is, the salvage must be considered as a lien upon the slaves themselves, and the amount to be decreed must be raised out of them, as out of other property. Here, then, I find the claim hedged about by fixed and known laws, over which it would be impossible for me to leap. I have heretofore decided, in the very outset of this case, that these alleged slaves cannot be sold. There is no law of the United States nor of the state of Connecticut by which the title can be given to them under any decree of this court. I am still confirmed in that opinion. It is impossible. Can a decree be predicated upon a supposed valuation to be ascertained by an appraisal? There is no authority in this court to cause such an appraisal. Who can appoint the appraisers? Who can administer to them an oath? And above all, by what rule could their estimate be formed? Are they to be estimated by their value in the district of Connecticut? That is not one cent. The laws which I am bound to administer can recognize no value on them. Can the appraisers travel into other states or countries to seek their value? Surely not. If a decree should be framed, it would be wholly nugatory, inoperative and void. This the court is never called upon to do. When a decree is made, it always presupposes that the court making it, possesses the power of enforcing it. This part of the claim, therefore, will be passed over.

Next comes the libel of Green and Fordham. This claim is rested upon the idea that they had taken possession of the vessel. The facts proved, will not sustain this claim. It appears in evidence, that these claimants found part of the Africans on shore, getting water and provisions. They traded with them and sold them two dogs, for a doubloon each, and then agreed to be there the next morning and take the vessel to their place. This was the understanding of Capt. Green, but as the evidence now appears, it was not the understanding of the negroes. Their hearts were set on Sierra Leone, and nothing short of sailing towards the sun would serve their purpose. They had killed the captain and cook, to go to Sierra Leone. They had periled their own lives for Sierra Leone, and still Sierra Leone was on the lips of Cinquez. I think the actions of the white men on the beach, evinced that they so understood this determination at the time. Otherwise they would not have had occasion to whistle off their dogs, when they had received for them the doubloons in hand. The result of the best examination which I have been able to

bestow on this part of the case is that the libels of Messrs. Green and Fordham be dismissed.

The two great questions still remain to be settled. Shall these Africans, by a decree of this court, be delivered over to the government of Spain, upon the demand of her minister, as the property of Don Pedro Montez and Don Jose Ruez? But if not, what ultimate disposition shall the government of the United States make of them? The other questions, in importance, cannot be compared with these. Here we have her majesty, the queen of Spain, by her resident minister, at the court of the United States, unequivocally demanding for her subjects these Africans, as their property in the fulfillment, as he says, of treaty stipulations, solemnly entered into by this nation. These Africans come in person, as our law permits them to do, denying this right. They say, that they are not the slaves of Spanish subjects, and are not amenable to Spanish laws. We have also the humanity of our own laws, ready to embrace them, provided we are not compelled by these treaty stipulations to deliver them up. Upon the first of these questions, all absorbing as it is, I am called upon to pronounce an opinion. And what I have now to say applies to Cinquez and others, who have filed their answer to the claim on record, not including Antonio. Shall these Africans be decreed to the Spanish government? What is the object of the demand made upon the president by the Spanish minister? Not to have them transported to Cuba for punishment, but because they are the property of Spanish subjects—their effects or merchandise—their property. I begin here by finding certain facts, which necessarily must be part of my decree, and upon which it must be based.

These are the facts that I find proved in this case: In Cuba there are three classes of negroes, well known and distinguished: Creoles, who were born within Spanish dominion; Ladinos, who have been long domiciliated on the island, or sufficiently so that the laws of Spain operate upon them, or, in other words, embracing those who owe Spain their allegiance; and, lastly, Bozals, embracing all such as have but recently been imported from Africa. The negroes now in question were all born in Africa; they were imported to Cuba, by the slave traffic, about which Montez and Ruez had nothing to do; they were put into a barracoon near Havana, and after remaining there not exceeding 15 days, Montez and Ruez brought them to the schooner L'Amistad as their slaves, and put them on board for Guanaja. Consequently I find these negroes to be Bozals; they were so at the time of the shipment. The demand of the Spanish government is, for these Bozals to be restored to them, that Montez and Ruez may have them as their property. To justify this demand, and require this government to restore them under the treaty, these negroes

must not only be property, but Spanish subjects must have a title to that property. In other words, Spanish subjects must own them—must come lawfully by them—they must have lawful right to hold them as their own. Suppose a slave should be demanded of us, by the Portuguese government, and it should appear in evidence that the slave in fact belonged to a citizen of South Carolina, we could not give him up to Portugal. Although he may be a slave, the Portuguese have no title in him. They cannot demand nor we surrender. The right of demand and the necessity of surrender rests on the title to the property. Property and title both are to be made out. In all cases where property and title are proved to be in Spanish subjects, the treaty is imperative, and at all hazards it must be surrendered. The obligations are solemn, and war might be the consequence of a breach of this duty on our part. I go up to the letter and spirit of the treaty both, but I do not step over it, merely because the demand is made by a high contracting power. The demand must be lawful. The minister has demanded the schooner, and suppose in point of fact it should turn out that the schooner belonged to a subject of France, instead of Spain, can we deliver it to Spain? Surely not. How stands the case here? The government of Spain demand of us, under their treaty, a restoration of these negroes, and we ask them for their title. It is a very well settled principle, here and elsewhere, that the party demanding restoration must show his title. The onus probandi lies on him. Aware of this rule of law, the Spanish claimants send to me their evidence of title. And what is that document,—a deed, a bill of sale, a transfer? No. It is a permit, a license, a pass, signed by the governor general of Cuba for Don Pedro Montez and Don Jose Ruez to transport 54 Ladinos to Guanaja, and this is all. This embraces the whole evidence of property and title both. In point of fact these are not Ladinos. They might be lawfully sold and carried to Guanaja. These negroes are Bozals and not Ladinos. Here, then, is the point—the point upon which this great controversy must turn. To show that it is so, I shall be obliged to recur to the laws of Spain, as the same are here proven, because these laws make a part of the case itself. They are to be proved in the courts of the United States as a matter of fact. This has been done on this inquiry, and this court is just as competent to judge of the effect of a foreign law, when thus proved, as of a law of the United States.

I find, then, as a matter of fact, that in the month of June, 1839, the law of Spain did prohibit, under severe penalty, the importation into Cuba of negroes from Africa. These negroes were imported in violation of that law, and be it remembered that, by the same law of Spain, such imported negroes are declared to be free in Spain. This ac-

counts for the declaration of the Spanish consul, "that if these negroes should be returned to Cuba, some of the leaders might be punished, but none of them could be made slaves." This declaration is in exact conformity with the law of Spain, so far as the matter of slavery is concerned. They could not be slaves there, because the law declares them free. They were Bozals and not slaves. This declaration is from a government functionary of Spain. Why, then, should the law be doubted by me? I do not doubt it. I do expressly find it to be such. If there had been any doubt as to what the law of Spain is. I ask, would not the Spanish minister resident at Washington have communicated that law to this government, so that it might have been sent here? We are bound to believe, that the minister of every foreign country brings with him the laws of his sovereign, and is able, on the shortest notice, to make those laws known to us when questions may arise. Between nations, it is not required that every matter of form should be strictly complied with. In the intercourse of friendly nations, the substance is all that is required. Why has not the Spanish minister told us that a law exists, by which Bozal negroes are slaves in Cuba? Why has he not sent us that law, with his claim? Ample time has been afforded. He knows that the burden of proof lies with him, and still withholds the law, if it does exist. How can he expect an American court to decree that these negroes are property, while he omits to produce the evidence which makes them such? In reply it may be said they were in possession of Spanish subjects. But possession is only one indicium of property, and that has been rebutted by the proof that these are Bozal negroes, and cannot be made property, by any machinery of sale or transportation.

This brings me to the question of title in Montez and Ruez, who now claim them through their government. Though they do not come into court in person, yet they do come in the majesty of their sovereign. They need not come in person, and if they do, they must stand aside and put forward the shield of regal authority. as they do in this case. But this establishes no title to property. Suppose I admit that slaves are property, yet Montez and Ruez must possess the title in themselves. "They have furnished no proof of payment; they have shewn no bill of sale; no witness has sworn that he was present when these negroes were sold. They have not shewn us from whom they derive their title. It is the naked possession on which they rely. When the right is disputed this is not enough. Suppose a gentleman in Mississippi hires a slave of his neighbor for one year, as a traveling servant, and while in Kentucky sells him? He had the possession, too, but he conveys no title, for it is the law of every country in the civilized world that a man must have a

title before he can grant to another. Were a gentleman of New Haven to rent me his house and give me the possession, and another person from Havana should come here and take a deed of that house from me, he would gain nothing by the grant, for the simple reason that I had no right to grant. This is so plain that the feeblest intellect cannot but see it. How does the Spanish minister fill up this chasm in the evidence? How does he link together this chain of the title? By nothing else except the governor general's passo, and this has before been commented upon. Now that official document is to serve the double purpose of proving property and title both; and yet when we look on it again, and apply it to our judicial test, if the expression may be allowed, we find that instrument still is for Ladinos and not Bozals. It contains, on its face, an untruth. The governor general has not given a passo for these negroes, and, consequently, these Bozals stand on the deck of the L'Amistad without any passo whatever. For a familiar illustration of this legal result, take, if you please, a bale of goods, for we will now call them goods, and have it shipped and invoiced at Liverpool, as cotton prints. They are entered here as cotton prints or smuggled in, and then sold to an innocent purchaser, when it is discovered for the first time that broadcloths compose the package. These broadcloths may be taken from this innocent purchaser, libelled and forfeited. Where is the remedy? The purchaser goes back to the seller, and he must take care of himself. Who sold those Bozals to Don Jose Ruez and took his twenty thousand dollars from him? I know not, but, if he does, there is his remedy. It is the sale of the article of goods to which he, the seller, had no title. And suppose this seller has absconded. or refuses to refund the money; it may be a hard case for Mr. Ruez, and yet "caveat emptor" is the well known maxim, and he must sit down by the loss, as many others are obliged to do. The purchaser must be vigilant in the investigation of the property he buys.

If there had been vigilance in this case, Ruez and Montez might have saved all their property, and the imminent hazard of life; and this court might have been relieved from this heavy responsibility, which has been pressing it down for these four months. Why did they not ascertain that these negroes were Bozals. This has been the source of all their complicated sufferings, the tale of which, will make the stoutest heart bleed. Why did they not ascertain that the law of Spain had declared these objects of their purchase not slaves? The secret is told in a word. In Cuba it is the custom to buy such negroes, and ship them as Ladinos or Creoles; and there respectable men have grown up under the influence of this custom—this practice against law. The subjects of a foreign government are presumed, however, to

know what their own laws are, and when broken, they cannot come here and ask us to invade the rights of others, in justification of the breach of their own laws. This would not be done, even there. Hence the Spanish consul says this mode of "bona fide" selling is carried on without notice from the local authorities. Not that the act is lawful, in itself, but only because the act is passed over. There is wealth and power on one side, and ignorance and weakness on the other. The law is the same there, as I pronounce it here. That it is not well executed is no evidence that the law does not exist. Let a case be presented to the courts in Spain, and the proof be made as it is here; and the result must inevitably be the same. This may be too obvious to require illustration. No one can set up, in a court of justice, an illegal custom, against positive law. One prime requisite of a custom is, that it should be lawful. The press gang system in England is against positive law! Every British subject, by law, is secured in his liberty. It is their boast; yet when the minister wants a thousand men for the navy, the press gang are put in motion. They seize and confine men, and tear them away from their wives and children, by force, and put them into service, against their will! Oppress and confine! And who will deny that these press gangs are actually paid by British gold, for their illegal depredations upon the sanctuary of home and liberty, and that, too, from the treasury of the nation? It is a custom, and has been for an hundred years; yet who will say it is legal? Let the "king's bench" pass upon this question, and it will be adjudged against law. It may be winked at in parliament, and stifled in public opinion, while they send their emissaries here, to teach us what liberty is, yet that is slavery! degrading slavery! and can never, no never, legalize the custom.

Shall these Bozals be given up under the treaty? and, if so, for what purpose? To have the question tried there, whether they are slaves by the laws of Spain? The Spanish law declares they are not slaves; it would be utterly useless, then, to send them back to Cuba. It would only be a work of supererogation. If, by their own laws, they cannot enslave them, then it follows, of necessity, they cannot be demanded. When these facts are known by the Spanish minister, he cannot but discover that the subjects of his queen have acquired no rights in these men. They are not the property of Spain. His demand must be withdrawn. The very essence of his demand consists in the supposed Spanish right of property in the thing demanded. That being removed, by his own law there can no longer be cause for complaint. At all events, this cannot be expected at my hands, because the supreme court have already refused to surrender property, unless there was proof of title in the claimants. The same rule applies equally to foreign and domestic claimants. Title must be shown in the property claimed, as belonging to the claimant, or it cannot be surrendered. The positions I have laid down here are fully recognized in The Antelope, 10 Wheat. [23 U. S.] 66. The argument of the attorney general in that case, sanctioned, as it is, by the able opinion of the chief justice, affords me full confidence that I am right. The strongest case which can possibly be adduced for the surrender is U. S. v. La Jeune Eugenie [Case No. 15,-551]. There a French ship, engaged in the slave trade, was brought into the Massachusetts district and libelled. The French minister made a demand of the vessel, and she was surrendered by Judge Story. But in that case the property was admitted to be in French citizens. They, themselves, were claimants against their own government, and both sides agreed that it was French property. The judge did right in surrendering it. But there is a great distinction between the two cases. Here the right of property is not only the principal contest, but I find clearly that the right of property is not in any Spanish subject whatever. The cases then are dissimilar in principle. Had this case, as in that, found the right of property in the claimants, I should have gone the whole length and breadth of that decision, and restored the property. This case is ample authority to that extent: and to show that I abide by the treaty, and that authority, I take another branch of this case. Antonio is demanded, and the proof from him is that he is a Creole, born, as he believes, in Spain. He was, at the time his master was murdered by Cinquez, a slave, so recognized and known by the laws of Spain. The property in him was in Raymond Ferrer, a Spanish subject, at the time of his death on board the schooner, and now is in his legal heirs. Here is both right and property in Spanish subjects. I shall decree a restoration of this slave, under the treaty of 1795. For this, likewise, I find authority in the cases adjudged by the supreme court, from which I have neither power nor inclination to depart.

The question remains: What disposition shall be made of these negroes by the government of the United States? There is a law of congress, passed the 3d of March, 1819 [3 Stat. 532], which renders it essential that all such Africans as these should be transported, under the direction of the president of the United States, to Africa. The humane and excellent provisions of this act, characterize the period when it was adopted. Among the prominent provisions of congress to ameliorate the condition of Africans brought away from their homes in this traffic, which is spoken of and believed to be odious, is this act of 1819. Considering the object embraced within these provisions, the statute itself must receive the most liberal and generous

construction. The technicalities of construction, which pertain to another class of acts, do not belong to this act. Those rules which govern courts in deciding on penal acts, are to find no place by the side of this statute. They must govern no mind employed in carrying out the noble intentions of the framers of this law. What is the spirit of that act? It is to return to the land of their nativity all such Africans as may have been brought from thence wrongfully. This being the spirit of that act, I stop not in the mere forms of legislation. I do not want to consider whether every letter and syllable of that act has been followed by the officers of the law. When the spirit of goodness is hovering over us, just descending to bless, it is immaterial in what garments we are clad to receive the blessing. I do not maintain this construction upon my own mere suggestion, but I shall be able to show, by a recent determination of the supreme court of the United States, that the door has already been opened, and the passage already provided, to send these men back to their own Africa. That if the aspirations of these unfortunate beings have been heard to rise for Sierra Leone, the law of that country into which they have been cast has provided the means, and already the supreme court have, in their profoundest wisdom, given a construction to that law which bids them Godspeed. The second section of the act of March 3, 1819, is as follows: "That the president of the United States be and is hereby authorized to make such regulations and arrangements as he may deem expedient, for the safe keeping, support, and removal beyond the limits of the United States, of all such negroes, mulattoes, or persons of color, as may be delivered and brought within the jurisdiction; and to appoint a proper person or persons, residing upon the coast of Africa, as agent or agents for receiving the negroes," &c. &c. The first section of the law of 1818 is left still in force, by the repealing clause of this act. Hence we must go to the law of 1818, and connecting it with the act of 1819, ascertain whether these Africans are within the spirit of this supervising care. This act of 1819, provides "that from and after its passage, it shall not be lawful to import or bring in any manner whatever, into the United States or territories thereof, from any foreign kingdom, place or country, any negro, mulatto, or person of color, with intent to hold any such negro as a slave or to hold to service or labor any such person."

We find these negroes here under circumstances most peculiar and complicated. It becomes necessary to go back to the period of their leaving Cuba, to ascertain whether they were brought in with an intent to hold to service, or to hold as slaves. How was the fact when they were put on board the L'Amistad? Was it not the intention of Don Montez to hold his four as slaves—to hold them to service? Was that the same with Don Jose Ruez? Surely they both intended to hold these negroes as slaves. We are to presume that intention continued after leaving Cuba, down to the time the captain was murdered. When did it change? It might have been suspended during the suspension of their power over the negroes, but we do learn from the evidence, that as soon as Lieut. Mead and the brig Washington appeared, their intentions were still the same. And the records of this court show that they have ever claimed to hold these slaves. It is doing them no injustice to say, that they still intend to hold them as their slaves. From whence were they brought? From a foreign country. Surely it cannot be necessary, that the slaves should have been brought direct from Africa. Their landing at Havana, for a few days, can make no difference, as to the grand objects of this act. I have before shown that Montez and Ruez never had any lawful authority, even to put their Bozal negroes on the deck of the L'Amistad. The first step was illegal, and of necessity every subsequent step was equally so. The original shipment under a false passport was illegal, and that same illegality continues with them over the waters of the Atlantic, and when they come into the port of New London the same intentions are continued by legal construction.

My attention is again turned to the phraseology of the act of [April 20] 1818 [3 Stat. 450]. "It shall not be lawful to import, or bring in any manner whatever, into the United States from any foreign country, any negro, with intent to hold him as a slave." No language more unqualified could have been adopted. Bring into the United States, in any manner whatever, any negro to hold to service. The next section confines the acts there made unlawful, to the citizens, vessels and places of the United States. Not so in the first section. The bringing in here with the intention to hold to service, anywhere, and in any place, is the broad language of the act. It is by no means to be limited and confined by strict construction, when we are seeking the objects of the bounty and humanity of the government. Far different would it be, I admit, if we were going on for a trial for the penalties imposed by this act. Then, indeed, we would be hedged about by the unbending rules of strict construction. Penal statutes must be construed strictly, but when there is, in the body of the same act, a bestowment of bounty, of protections, of guardianship, we reject with disdain these narrow rules. We rise above the technicalities and criticisms, which belong to punishment, and the criminal code, and adopt that construction which is more congenial with the objects of the law.

It is humbly conceived that these prin-

ciples governed the supreme court of this Union in the case of U. S. v. Preston, 3 Pet. [2S U. S.] 57. The marginal note [syllabus] of that case gives us the great principle of construction there adopted by the unanimous voice of the court: "The final condemnation of the persons on board the Josefa Segunda, took place in this case, on the 13th of March, 1820, after congress had passed the act of the 3d of March, 1819, entitled, 'An act in addition to an act prohibiting the slave trade,' by the provisions of which persons of color brought in under any of the acts prohibiting traffic in slaves, were to be delivered to the president of the United States, to be sent to Africa." That vessel was seized in the waters of the United States by the collector of the port of New Orleans. The seizure was never made by any one of our government vessels, under the commission of the president. The act of 1819, strictly construed, would seem to limit the action of the president to seizures made by armed vessels, under a special commission. But here, this vessel, the Josefa Segunda, came into our waters under the plea of distress; she was never seized or touched by one of our armed vessels, but the collector of New Orleans put his foot on board, and had her libelled, and the supreme court decreed the Africans back to their own country. In that case there never was a descriptive list made out, as the act of 1819 would seem to require, yet the Africans on board were given over to. the president. There never was any complaint made up, as that act prescribes, yet all this is considered mere matter of form, and it is made to yield to the benevolent provisions contained in the act of 1819. In truth this act of 1819 was not in being, it was not passed, when the Josefa Segunda was seized; yet these negroes were found in the custody of the court by that act, and the protection of the government is thrown around them. The humane provisions and principles of the act of 1819 are thrown over them. They are made to participate in the benefits of that act, and the arm of the president conducts them safely to the shores of Africa. The Josefa Segunda was a Spanish vessel. She came into the Mississippi, and was seized by the collector of New Orleans, and libelled under the law of 1807, for condemnation, as having been engaged in the slave trade. Her plea was, that she came into our waters in distress. She was captured on the 11th of February, 1818, more than a year before the passage of the act of congress of March 3, 1819. The case underwent a variety of trials, and at last was determined in January term, 1830, by the supreme court. 3 Pet. [28 U. S.] 57. Justice Johnson gives the opinion of the court, a part of which I quote in this place:

"The case of the Josefa Segunda has been twice already before this court: The first time upon the question of condemnation; the second upon the application of several claimants to be preferred in the distribution of the proceeds. It now comes up upon a claim to the proceeds of the persons of color found on board at the time of the seizure, interposed by the law officer of the state of Louisiana. The vessel was condemned under the seventh section of the act of 1807 [2 Stat. 426], passed to abolish the slave trade. By the fourth section of the act, the state of Louisiana was empowered to pass laws for disposing of such persons of color as should be imported or brought into that state, in violation of that law. The offence under the seventh section, on which this condemnation was founded, is not that of importing or bringing into the United States, but that of hovering on the coast with intent to bring in, persons of color to be disposed of as slaves, in violation of law; and although it forfeits the vessel and any goods or effects found on board, it is silent as to disposing of the colored persons found on board, any farther than to impose a duty upon officers of armed vessels, who may capture them, to keep them safely, to be delivered to the overseers of the poor, or the governor of the state, or persons appointed by the respective states to receive the same. The state of Louisiana passed an act on the 13th of March, 1818 [Laws, p. 68], which recites the provisions of the fourth and seventh sections of the acts of congress, and authorizes and requires the sheriff of New Orleans to receive any colored persons designated under either of those sections, and the same to keep, until the district or circuit court of the United States shall pronounce a decree upon the charge of illegal importation. The second section makes a provision for selling them, and receiving a certificate of such decision, and enjoins a distribution of the proceeds; one-half to the commanding officer of the capturing vessel, the other to the treasurer of the charity hospital of New Orleans. In pursuance of the law of the state, it appears, that after the decree of condemnation below, but pending the appeal in this court, the sheriff went on to sell, with the consent, it is said of all parties; and $65,000, the sum now in controversy, was deposited in the registry of the court below to await the final disposal of the law. On the 20th of April, 1818 [3 Stat. 450], congress passed another act on this subject, by the tenth section of which, the six first sections of the act of 1807 are repealed; but their provisions are re-enacted with a little more amplitude; and the fifth section of this act, which professes to reserve to the states the powers given in the former act, as well as the language of the repealing clause, in the saving which it contains as to offences, still confines all their provisions to the case of illegal importation; thus leaving the seventh section in force, but without any express power to dispose of the colored persons, otherwise than to appoint some one to receive them. The final condemnation in this court

took place in this court March 13, 1820; but previous to that time was passed the act of March 3, 1819, entitled 'An act in addition to an act prohibiting the slave trade;' by which a new arrangement is made as to the disposal of persons of color seized and brought in under any acts prohibiting the traffic in slaves. By the latter act, they are deliverable to the orders of the president; not of the states. And the repealing clause repeals all acts and parts of acts which may be repugnant to this act. So that if in the disposal of persons of color brought into the United States, the provisions of this act embrace the cause of such persons when brought in under the seventh section of the act of 1807, the power to deliver them to the order of the states was taken away before the final decree of this court. Such, in the opinion of the court, is the effect of the act of 1819. And then the question is, how does it affect the present controversy? Ever since the case of Yeaton v. U. S., 5 Cranch [9 U. S.] 281, the court has uniformly acted under the rule established in that case; to wit, that in admiralty causes a decree was not final while it was depending here. And any statute which governs the case, must be an existing, valid statute, at the time of affirming the decree below. Whatever was the extent of the legal power of the state over the Africans, it is clear that such power could not be exercised finally over them at any time previous to the final decree of this court. We must therefore consider, whether, if they had been specifically before the court at the date of that decree, they must have been delivered up to the state, or the United States, clearly to the United States."

One of the questions discussed in The Antelope, 10 Wheat. [23 U. S.] 66, was as to the title of the claimants, and who should produce the proof of title. The decision of that case establishes, beyond question, that the claimant must prove title in himself. It is the same here. There, those who established their title, received their property, and in that case, as in this, those negroes to whom title was not made out, were decreed to the United States. Cinquez and Grabeau shall not sigh for Africa in vain. Bloody as may be their hands, they shall yet embrace their kindred. I shall put in form a decree of this court, that these Africans, excepting Antonio, be delivered to the president of the United States to be transported to Africa, there to be delivered to the agent, appointed to receive and conduct them home. To do it, we have ample authority, and ample means. What American can object to this decree? No one surely, when the case is correctly understood. It will indeed require the executive arm to carry out this decree. This may well be anticipated, because the facts which I have found and shall put upon record, will carry conviction to every mind. Antonio, falling clearly within the other principle, and in the presence of the court, expressing a strong wish to be returned, will be decreed to the government of Spain, with the vessel and goods, the vessel and goods being alone subject to the lien which necessity of the case has thrown upon them, for the salvage service and the cost.